UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br>  v.<br><br>$102,836.00 IN UNITED STATES CURRENCY,<br><br>       Defendant.<br><br>SANTIAGO CRUZ,<br><br>       Claimant. | 3:10-CV-00682-LRH-WGC<br><br>ORDER |

This is a civil forfeiture action. Before the Court is the United States' Renewed Motion for Summary Judgment. Doc. #33.[1] Claimant Santiago Cruz's ("Cruz") filed an Opposition (Doc. #34), to which the United States did not reply.

///

///

///

///

///

---

[1] Refers to the Court's docket number.

## I. Facts and Procedural History

On July 12, 2010, Cruz was driving westbound on Interstate 80 near Sparks, Nevada when Nevada Highway Patrol ("NHP") Trooper Jason Phillips[2] ("Phillips") pulled him over for speeding and for an obtrusively-placed Global Positioning System ("GPS") device mounted on Cruz's windshield.[3]  Doc. #16 (Phillips Decl.), ¶4.  Thereafter, Phillips approached Cruz's vehicle to request identification.  *Id.* at ¶5.  Cruz produced his Nevada driver's license.  *Id.*  Phillips advised Cruz of the reason for the traffic stop and further informed Cruz that it was not his intention to issue a citation.  *Id.* at ¶6.  Cruz then volunteered that the car was a rental, and produced the rental agreement, which stated that the rental period for the vehicle began on June 28, 2010, in Las Vegas, Nevada, and was due back to Las Vegas one week earlier, on July 5, 2012.  *Id.* at ¶9.  Cruz explained that he was on his way to Fairfield, California from Battle Mountain, Nevada and had extended the rental term over the phone.  *Id.* at ¶9; Doc. #22-1 (Cruz Decl.), ¶4.  Cruz indicated that he was picking his mother up in Fairfield for a friend's funeral back in Battle Mountain.  Doc. #22-1, ¶6.

Upon approaching the vehicle, Phillips recognized the odor of marijuana and the strong odor of air freshener coming from the interior of the vehicle.[4]  Doc. #16, ¶7.  Phillips also observed Cruz to exhibit signs of nervousness and anxiety as he was looking for the rental agreement and repositioning the GPS device.  *Id.* at ¶8.  Phillips then asked Cruz to exit the vehicle while the records check was being processed.  *Id.* at ¶10.  As Cruz was exiting the vehicle, Phillips detected

---

[2] At the time of the traffic stop, Phillips was a member of the Northern Nevada Interdiction Task Force. Doc. #16, ¶¶1-3.  He had received specialized training in highway interdiction, narcotics K-9 handling, and drug-offense and asset forfeiture investigations. *Id.*

[3] It is against Nevada law to drive a vehicle at a rate of speed greater than the posted speed limit (NRS 484B.600) and to drive a vehicle with an obstructed front windshield (NRS 484D.435).

[4] Cruz denies that there was any marijuana in the vehicle. Doc. #22-1, ¶15.  Moreover, the search of the vehicle did not lead to the discovery of any marijuana.

2

the odor of marijuana coming from Cruz's person.[5]  *Id.*  At that point, Cruz informed Phillips that he had a prior drug-related arrest.  *Id.* at ¶11.  The records check subsequently confirmed a prior drug-related arrest and conviction.  *Id.*  At some point during the traffic stop, Washoe County Deputy Sheriff Zirkle ("Zirkle") arrived to assist Phillips.  *Id.* at ¶12.

Suspecting criminal drug activity, Phillips contacted NHP Trooper Erik Lee ("Lee") to inquire as to the availability of a canine unit.  *Id.* at ¶13.  Thereafter, Lee arrived with a trained drug-detection canine, "Petey," who, upon deployment, positively alerted to the trunk and the rear passenger door of Cruz's vehicle, indicating the presence of the odor of illegal drugs in the right rear passenger section of the vehicle.[6]  Doc. #17 (Lee Decl.), ¶¶4, 6.  Based on the totality of the circumstances, Phillips, Lee, and Zirkle conducted a search of the vehicle.  *Id.* at ¶7; Doc. #16, ¶14.  The search yielded discovery of two duffel bags containing cash, one in the trunk and one on the rear passenger seat of the car.  Doc. #16, ¶15.  The currency, which was found in several bundles bound together with rubber bands, totaled $102,836.00.  *Id.* at ¶¶16-17.  The search also yielded discovery of a "pay-owe" sheet or price list showing various sources and quantities of marijuana or amounts owed to various persons for various types of drugs[7] (*id.* at ¶18, Ex. 10), two pre-paid cell phones (*id.* at ¶18, Ex. 13), a package of resealable plastic "Ziploc"-type bags (*id.* at ¶18, Ex. 11), and various receipts showing travel and purchases in multiple locations over the course of the previous two weeks (*id.* at ¶19, Exs. 3, 4, 5, 6, 7, 8, 14, 15).

///

---

[5]  While Cruz also denies that he smokes marijuana (Doc. #22-1, ¶15), the Court finds this fact irrelevant to the summary judgment inquiry.

[6]  Cruz testified that Petey never alerted to the interior of the car, to his person, or to the bag from the car.  Doc. #22-1, ¶10.  However, Lee testified that after the currency seized was sealed in an evidence bag and transported to the Reno NHP building, Petey alerted to the box which contained the evidence bag containing the currency.  Doc. #17, ¶12.

[7]  Cruz disputes that the piece of paper was a "pay-owe" sheet; rather, Cruz asserts that the piece of paper listed various types of medical marijuana and the prices of each.  Doc. #22-1, ¶16.

Upon being presented with the results of the search and upon being questioned about the source of the currency, Cruz stated that he had sold a business and had also earned money through wages and gaming. *Id.* at ¶20. Officer Lee inquired as to how much money was in the bag, and Cruz replied that he had "no idea" how much money he had in the vehicle, but estimated that there was approximately $1,000.00 in the black duffel bag located on the rear passenger seat of the vehicle. Doc. #17, ¶11. The black duffel bag was later determined to contain approximately $40,000.00. *Id.* Cruz, however, testified that he didn't tell the officer anything about the money. Doc. #22-1, ¶11.

On November 1, 2010, the United States filed a Complaint in Forfeiture against the Defendant Currency. Doc. #1. Thereafter, Cruz filed a Notice of Claim of Ownership (Doc. #5) and Answer (Doc. #7). On October 29, 2012, the United States filed a Motion for Summary Judgment. Doc. #15. On July 2, 2013, the Court entered an Order denying the United States' Motion for Summary Judgment, finding that genuine issues of material fact as to whether Phillips had developed the requisite reasonable suspicion to detain Cruz for "20 to 30 minutes" in anticipation of the canine unit precluded summary judgment. Doc. #24. Thereafter, Cruz filed a Motion to Suppress. Doc. #27. The Court ultimately denied Cruz's Motion, concluding that the 20 to 30 minutes during which Cruz was detained for further investigation was supported by reasonable suspicion and, therefore, did not violate the Fourth Amendment. Doc. #32. On March 26, 2014, the United States renewed its Motion for Summary Judgment. Doc. #33.

**II.    Legal Standard**

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001). On an issue as to which the non-moving party has the burden of proof, however, the moving party can prevail merely by demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case. *Celotex*, 477 U.S. at 323.

To successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute; there must be evidence on which a jury could reasonably find for the party. *See id.* at 252.

**III. Discussion**

Under the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), the government has the burden to prove by a preponderance of the evidence that the defendant property is subject to forfeiture. 18 U.S.C. § 983(c); *United States v. $80,180.00 in U.S. Currency*, 303 F.3d 1182, 1184 (9th Cir. 2002). When "the [g]overnment's theory of forfeiture is that the property was used to

commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the [g]overnment shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3). The determination of whether the government has met its burden of proof is based on the aggregate of facts including circumstantial facts. *United States v. $42,500.00 in U.S. Currency*, 283 F.3d 977, 980 (9th Cir. 2002); *see also United States v. $30,060.00 in U.S. Currency*, 39 F.3d 1039, 1041 (9th Cir. 1994). The burden then shifts to the claimant to prove by a preponderance of the evidence that the claimant is an innocent owner of the property. 18 U.S.C. § 983(d). Specifically, the claimant has the burden to "prove the money had an independent source and had not been used illegally." *United States v. $22,474.00 in U.S. Currency*, 246 F.3d 1212, 1217 (9th Cir. 2001) (citing *United States v. $215,300.00 in U.S. Currency*, 882 F.2d 417, 420 (9th Cir. 1989)).

Here, the United States' is pursuing forfeiture under 21 U.S.C. § 881(a)(6), which subjects currency to forfeiture if: (1) it were "intended to be furnished . . . in exchange for a controlled substance," (2) it were "proceeds traceable to such an exchange," or (3) it were "intended to be used to facilitate a violation of [the Controlled Substances Act, 21 U.S.C. § 801 *et seq*.]" Therefore, the United States must establish that a "substantial connection" exists between the currency and an illicit transaction by a preponderance of the evidence. Contrary to the United States' assertion that the only genuine issue of material fact which earlier precluded summary judgment has now been resolved through the Court's Order denying Cruz's Motion to Suppress (Doc. #32), the Court did not reach the underlying merits of the United States' Motion for Summary Judgment.

**A.   Evidence Supporting Probable Cause to File the Forfeiture Complaint**

In interpreting CAFRA, the Ninth Circuit retained the section 1615 probable cause pleading requirement. *United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1169 (9th Cir. 2008) (holding "that section 1615 continues to require that the government show probable cause to institute a forfeiture action"). The Ninth Circuit uses the "aggregate of the facts test" to

determine whether the government has the requisite probable cause to institute forfeiture. *$42,500.00 in U.S. Currency*, 283 F.3d at 980-82. Under this test, the government has met its burden if "the aggregate of facts gives rise to more than mere suspicion that the property was exchanged for or intended to be exchanged for drugs." *United States v. $5,644,540.00 in U.S. Currency*, 799 F.2d 1357, 1363 (9th Cir. 1986). "Each case stands upon its own facts, and the presence or absence of any one fact is not dispositive; indeed probable cause is not an exacting standard." *$42,500.00 in U.S. Currency*, 283 F.3d at 980. The presence or absence of any single fact is not dispositive. *$5,644,540.00 in U.S. Currency*, 799 F.2d at 1363.

The probable cause determination may be based only upon information gathered before the forfeiture action was instituted. *$493,850.00 in U.S. Currency*, 518 F.3d at 1169. However, "[t]he government may establish probable cause by relying on 'otherwise inadmissible hearsay' because '[t]he question of probable cause depends not upon the admissibility of the evidence upon which the government relies but only upon the legal sufficiency and reliability of the evidence.'" *United States v. $405,089.23 in U.S. Currency*, 122 F.3d 1285, 1289 (9th Cir.1997) (quoting *United States v. One 56-Foot Motor Yacht Named the Tahuna*, 702 F.2d 1276, 1283 (9th Cir. 1983)). The government may rely on circumstantial evidence to meet its burden. *United States v. Real Prop. Located at 22 Santa Barbara Drive*, 264 F.3d 860, 872 (9th Cir. 2001).

       **1.**      **Quantity of Currency, Denominations, and Location and Packaging**

Here, Cruz was carrying an extraordinary sum of money, totaling $102,836.00 in cash. Doc. #16, ¶16. While a large amount of cash, on its own, does not establish probable cause, it can be considered "'in combination with other persuasive circumstantial evidence,'" *$405,089.23 in U.S. Currency*, 122 F.3d at 1291 (quoting *United States v. Padilla*, 888 F.2d 642, 644 (9th Cir. 1989)), and may be "strong evidence that the money was furnished or intended to be furnished in return for drugs." *United States v. $29,959.00 in U.S. Currency*, 931 F.2d 549, 553 (9th Cir. 1991) (finding cash amounting to $29,959.99 is an "extremely large amount" to be kept in the home); *see also $42,500.00 in U.S. Currency*, 283 F.3d at 981-82 (noting that a large amount of cash is strong

7

1 evidence that the money was furnished or intended to be furnished in return for drugs; however, possession of a large sum of money standing alone is insufficient to establish probable cause). Additionally, the currency was recovered from two separate locations—one black duffel bag and one yellow and black duffel bag—and included 563 one-hundred-dollar bills and 2,031 twenty-dollar bills. Doc. #16, ¶16; *see United States v. $67,391.00 in United States Currency*, 2013 WL 5645349, at *9 (N.D. Cal. Oct. 15, 2013) (finding that the number of bills and the lower denominations of bills were consistent with street level narcotics sales).

Also significant, the currency was found in several bundles, each bound together with rubber bands. Cases appear to go both ways when a large amount of cash is merely rubber-banded into bundles, rather than, for example, wrapped in cellophane. *See United States v. $242,484.00 in U.S. Currency*, 389 F.3d 1149, 1161-62 (11th Cir. 2004) ("A common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a backpack. They don't, because there are better, safer means of transporting cash if one is not trying to hide it from the authorities."); *but see U.S. Currency, $30,060*, 39 F.3d at 1042 ("The government contends that drug dealers carry their money in wrapped bundles and that $30,060 is consistent with the cost of two kilograms of cocaine. It provides, however, no authority for these contentions, which are, in any case, speculative."); *cf. $42,500.00*, 283 F.3d at 982 ("[C]ellophane, which is largely impermeable to gas, is commonly used to conceal the smell of drugs and avoid detection by drug dogs."). However, because "[b]undles of cash in various denominations wrapped in rubber bands has been found to be 'indicative of a drug organization bundling money,'" *United States v. Approx. $77,000.00 in U.S. Currency*, 2012 WL 1196498, at *10 (E.D. Cal. Apr. 10, 2012) (citing *$242,484.00 in U.S. Currency*, 389 F.3d at 1161-62), the Court finds that, when combined with other undisputed facts in this case, the rubber-band bundling of the Defendant currency supports a finding of probable cause.

///

### 2. Seizure of Drug-Related Items and Travel Itinerary Consistent with Narcotics Trafficking

Here, the search of the vehicle yielded the discovery of a "pay/owe" sheet or price list reflecting various prices for marijuana.[8] Doc. #16, ¶18. Additionally, the search revealed a package of resealable "Ziploc"-type plastic bags, two pre-paid cell phones, and a number of receipts showing travel and purchases in multiple locations over the previous two weeks. *Id.* Significantly, the receipts documented the following: Cruz rented the Chevrolet vehicle at the Las Vegas Airport on June 28, 2010; Cruz entered the Phoenix Airport parking lot on June 29, 2010; Cruz checked into the Fairfield Hilton in Fairfield, California on June 29, 2010; Cruz made beverage purchases in Fairfield, California on June 29 and 30, 2010; Cruz purchased 3 duffel bags, 4 boxes of plastic bags, and 1 box of oven bags at a Wal-Mart in Santa Rosa, California on June 30, 2010; Cruz checked out of the Hilton in Fairfield, California on July 1, 2010; Cruz rented another vehicle in Oakland, California on July 1, 2010; Cruz returned the second rental vehicle in Las Vegas on July 2, 2010; Cruz checked into a Motel-6 in Scottsdale, Arizona on July 3, 2010; Cruz checked out of the Scottsdale motel on July 4, 2010; and Cruz retrieved the first rental car from the Phoenix Airport parking lot on July 4, 2010. *Id.* at ¶19.

Certainly, the presence of drug paraphernalia, such as the "pay/owe" sheet or price list, the plastic bags, and the multiple cell phones, is circumstantial evidence relevant to the Court's determination of probable cause. *See United States v. $93,685.61 in U.S. Currency*, 730 F.2d 571, 572 (9th Cir. 1984) (describing drug paraphernalia located with seized currency as persuasive circumstantial evidence). Additionally, the Court finds that the receipts evidencing travel and purchases in multiple locations over the previous two weeks add to the Court's evaluation of

---

[8] Cruz testified that his friend, Travis Hill, that lived and died in Battle Mountain was a cancer patient and he wanted to know the prices of medical marijuana. Doc. #22-1 (Cruz Decl.), ¶16. Cruz further testified that the document described by the United States as a "pay/owe" sheet was a list of the medical marijuana prices for his friend. *Id.*

9

probable cause. Specifically, the Court finds particularly relevant the fact that Cruz had rented two vehicles—one in Las Vegas and one in Phoenix—as well as his purchases at Wal-Mart.

### 3. Odor of Marijuana and Air Freshener

Here, Philips testified that, upon approaching the vehicle, he recognized the odor of marijuana coming from the interior of the vehicle. Doc. #16, ¶7. Additionally, Cruz testified that upon exiting the vehicle, Philips detected the odor of marijuana on Cruz's person. *Id.* at ¶10. *See United States v. Scheetz*, 293 F.3d 175, 184 (4th Cir. 2002) (finding that the smell of marijuana emanating from an automobile constituted probable cause to believe marijuana was present in the vehicle); *see also United States v. Leazar*, 460 F.2d 982, 984 (9th Cir. 1972) (patroller's olfactory detection of marijuana odor in arrestee's vehicle created probable cause for arrest). Additionally, Cruz testified that he detected a strong odor of air freshener inside the vehicle. *Id.* at ¶7. Based upon his training and experience, Philips testified that he is aware that persons involved in drug trafficking will use excess amounts of air freshener in an effort to mask the odor of drugs. *Id.*; *see also $493,850 in U.S. Currency*, 519 F.3d at 1169 (finding relevant to the probable cause inquiry the fact that the truck smelled strongly of air freshener and that, in the officer's experience, suspects often use strong air freshener to cover the smell of narcotics). Accordingly, the Court finds that these factors weigh heavily in favor of finding probable cause for the forfeiture.

### 4. Positive Dog Alert

Here, it is undisputed that Petey positively alerted to the right rear quarter panel of the vehicle. Doc. #17, ¶6. Additionally, it is undisputed that after the Defendant currency was segregated from the vehicle, Petey again alerted to the currency itself, indicating the presence of the odor of drugs on the currency. *Id.* at ¶12. Cruz, however, contests the reliability of the positive alert, arguing that Lee's affidavit is insufficient to establish that Pete is a well-trained narcotics-detection dog.

The Ninth Circuit has held that "a sophisticated dog alert, where the dog reacts only to ephemeral by-products of narcotics and not to commonly circulated currency, is an important factor

10

in determining probable cause." *$42,500.00 in U.S. Currency*, 283 F.3d at 982 (citing *$22,474.00 in U.S. Currency*, 246 F.3d at 1216 (explaining that because of more sophisticated training a narcotics canine would not alert to money unless it had recently been in the proximity of cocaine)). However, "Ninth Circuit cases relating to the probative value of positive dog alerts do not foreclose the use of a positive dog alert—whether by a 'sophisticated' one or not—from supporting probable cause under the totality of the circumstances." *United States v. $127,000 in U.S. Currency*, 2012 WL 2917467, at *12 (N.D. Cal. July 17, 2012). Accordingly, while the "sophistication" of a particular canine may bear upon the weight to be given to the positive drug alert, a positive alert is nevertheless meaningful and thus factors into the Court's probable cause determination. *See id.*

Here, Petey was trained to detect methamphetamine, cocaine, marijuana, and heroin. Doc. #17, ¶2. The United States further claims that Petey is a "sophisticated dog" within the meaning of *$22,474.00 in U.S. Currency*, as he is trained to alert only to the odors emanating from illegal narcotics. *See* Doc. #23, p. 14. However, the United States did not submit any evidence indicating that Petey underwent sophisticated training such that he would not alert to narcotics residue on currency in general circulation. Nevertheless, the Court rejects Cruz's contention that Petey's alert is *per se* unreliable. Rather, the Court finds that the positive alert has probative value as one factor, among many, supporting probable cause.

### 5. Prior Drug-Related Arrest and Conviction

A claimant's history of drug-related offenses is relevant circumstantial evidence which weighs heavily in support of probable cause. *See $493,850.00 in U.S. Currency*, 518 F.3d at 1169 (evidence linking claimant to narcotics traffickers, combined with other evidence, was sufficient to satisfy probable cause); *United States v. Approximately $1.67 Million (US) in Cash*, 513 F.3d 991, 999 (9th Cir. 2008) (finding that "[e]vidence of a prior drug conviction is probative of probable cause" in drug trafficking cases) (citing *$22,474.00 in U.S. Currency*, 246 F.3d at 1217) ("[e]vidence of a prior drug conviction is probative of probable cause")). During the course of the traffic stop, while the records check was under way, Cruz volunteered that he had a prior drug-

11

related arrest. Doc. #16, ¶11. The records check subsequently confirmed that Cruz had a prior drug-related arrest and conviction. *Id.*

### 6. Cruz's Nervous Demeanor and False or Inconsistent Statements

In forfeiture cases, a claimant's behavior at the time of the traffic stop may support an inference that the claimant was engaged in some criminal activity. *See United States v. $129,727.00 in U.S. Currency*, 129 F.3d 486, 490 (9th Cir. 1997) (claimant's nervous behavior relevant to enquiry regarding probable cause for seizure of currency). Here, Phillips testified that Cruz exhibited excessive nervousness and anxiety when looking for the rental agreement. Doc. #16, ¶8.

Additionally, inconsistent and false statements regarding the amount of money a claimant is carrying is also relevant to the determination of whether the United States had probable cause for the forfeiture. *See $22,474.00 in U.S. Currency*, 246 F.3d at 1216-17 (9th Cir. 2001) (taking note of claimant's conflicting statements regarding the amount of money he was carrying and indicating that this facts "tended to support an inference that the money was drug-related"); *United States v. $191,910.00 in U.S. Currency*, 16 F.3d 1051, 1072 (9th Cir. 1994) (superseded by statute on unrelated grounds) (discrepancies in story may be factors to consider in determining probable cause). After the search yielded discovery of the duffel bags containing the Defendant currency, Lee questioned Cruz about how much money he had in the vehicle. Doc. #17, ¶11. Cruz replied that he had "no idea" how much money he had in the vehicle, but then stated that there was approximately "$1,000" in the black duffel bag.[9] *Id.* The black duffel bag was later determined to contain approximately $40,000. *Id.*

///

///

---

[9] Cruz does not specifically deny that he answered Lee's questions regarding the amount of money he had in the car.

### 7. Totality of the Circumstances

Based on a review of the aforementioned circumstances, which were known before the forfeiture action was instituted, the Court finds that the United States had the requisite probable cause to believe that the Defendant currency was exchanged for or intended to be exchanged for drugs. While none of these facts taken alone would create probable cause, the aggregate of facts raise more than a mere suspicion of a connection between the seized money and drugs; they establish probable cause to initiate civil forfeiture.

### B. Substantial Connection Between Defendant $102,836.00 and Drug Trafficking

After meeting this initial burden, "the burden of proof is on the [g]overnment to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1). A forfeiture claim brought under 21 USC § 881(a)(6) requires the government to show, by a preponderance of the evidence, a "substantial connection" between the currency at issue and the alleged illegal drug activity. 18 U.S.C. § 983(c)(1); *United States v. One 1986 Ford Pickup*, 56 F.3d 1181, 1187 (9th Cir. 1995). The determination of whether the government has met its burden of proof is based on the aggregate of the facts, including circumstantial evidence. *$42,500.00 in U.S. Currency*, 283 F.3d at 980. The government may rely on evidence used in supporting probable cause, as well as additional evidence gathered after the filing of the complaint. *$493,850.00 in U.S. Currency*, 518 F.3d at 1170 (citing 18 U.S.C. § 983(c)(2)).

In addition to the evidence set forth above supporting probable cause, the United States adduced further evidence, gathered after the filing of the Complaint, in order to prove that the Defendant currency is subject to forfeiture. First, the United States urges that Cruz's reported income for the several years prior to the July 2010 seizure is inconsistent with his claimed ownership of the Defendant currency. Cruz had no reported income for 2003, 2004, and 2005.[10]

---

[10] Cruz stated that he was "pretty sure" he provided those tax returns. Doc. #18, Ex. A (Cruz Depo.), 49:22-25. However, there is no indication that they were even filed or provided to the United States in discovery.

Doc. #18, Ex. A (Cruz Depo.), 49:19-50:8.  In 2006, Cruz reported $46,554.00 in wages.  *Id.* at 67:16-22.  In 2007, Cruz reported $11,538.00 in wages.  *Id.* at 61:12-23.  Additionally, Cruz was unemployed for part of 2007 and for the entirety of 2008, 2009, 2010, and 2011, during which time he collected unemployment benefits.[11]  *Id.* at 17:24-19:23.  In 2008, Cruz reported unemployment benefits in the amount of $13,838.00.  *Id.* at 18:23-19:5, 28:1-18.  He did not file a tax return for 2009, 2010, or 2011.  *Id.* at 22:17-23, 24:5-21, 17:20-21.  In light of this evidence, the Court agrees that Cruz's insufficient reported income for the years leading up to the July 2010 currency seizure is far from reconcilable with his claimed ownership of the Defendant currency.  This factor alone strongly supports forfeiture.  *See United States v. $174,206.00 in U.S. Currency*, 320 F.3d 658, 662 (6th Cir. 2003) (evidence of legitimate income that is insufficient to explain the large amount of property seized, unrebutted by any evidence pointing to any other source of legitimate income or any evidence indicating innocent ownership, satisfies the burden imposed by the statute").

Second, Cruz offered inconsistent explanations as to his possession of such a massive amount of cash, as well as his knowledge of the amount of cash he had with him.  Initially, when confronted with the results of the search, Cruz stated that he had sold a business and had also earned money through wages and gaming.[12]  Doc. #16, ¶20.  Later, in a declaration, Cruz offered an entirely different explanation for his possession of the currency.[13]  Namely, Cruz does not claim that he earned the money through wages and gaming.  Cruz also initially stated that he had "no idea" how much money he had in the vehicle, but then estimated that there was approximately $1,000.00 in the black duffel bag.  Doc. #17, ¶11.  The black duffel bag was later determined to

---

[11] In addition to collecting unemployment benefits, Cruz claims that between 2006 and 2008, and perhaps 2009, he generated additional income from selling various products on-line.  Doc. #18, Ex. A (Cruz Depo.), 23:4-24:2.  Nevertheless, he does not provide any evidence to substantiate this claim.

[12] Cruz does not specifically deny offering this explanation for his possession of the currency.

[13] The Court discusses Cruz's proffered explanation for his possession of the currency in greater detail in Section III.C.

14

contain approximately $40,000.00. *Id.* Later, in a deposition, Cruz acknowledged that he had packed a little over $100,000.00 in cash when he left Las Vegas for Battle Mountain and that he "had an idea of how much money [he] had." Doc. #18, Ex. A, 105:6-14. Cruz's inconsistent statements in these regards is relevant evidence that the Defendant currency is connected with illegal drug activity. *See $493,850.00 in U.S. Currency*, 518 F.3d at 1169.

Third, the United States argues that Cruz's movements and actions during the two weeks prior to the currency seizure—including two overlapping car rentals in separate locations and the acknowledged purchase of marijuana in California—support forfeiture. Specifically, the United States references Cruz's lengthy deposition testimony in which he is unable to offer a clear explanation as to how and why, in the two weeks prior to the seizure, he drove the first rental car from Las Vegas to Phoenix, parked it at the Phoenix airport for one week while he flew to California, stayed in a hotel in Fairfield where his mother and sister live, somehow got to Santa Rosa to buy marijuana for his dying friend, made unexplained purchases at a Wal-Mart in Santa Rosa, rented a second car in Oakland and drove back to Las Vegas where he returned the second rental car, somehow got back to Arizona to retrieve the first rental car, drove back to Las Vegas to pack his bags and money, proceeded to Battle Mountain because his friend's death was imminent, left Battle Mountain to pick up his mother in Fairfield for the funeral, and then abandoned his trip to pick up his mother in California after he was stopped by Phillips and the Defendant currency was seized. *See* Doc. #18, Ex. A, 83:6-118:25.

Indeed, a review of Cruz's deposition testimony regarding his travel in the two weeks prior to the seizure reveals little in the way of a rational or reasoned explanation for his activities. He is unable to articulate why he traveled to certain places and how he got to certain places. Moreover, he is unable to account for certain events or unravel the sequence in which those events took place. While slight inconsistencies or implausibilities in a claimant's story may not amount to much, the Court finds that the cumulative effect of the aforementioned inconsistencies and implausibilities weighs heavily in the Court's consideration of whether the Defendant currency is subject to

forfeiture. *See $22,474.00 in U.S. Currency*, 246 F.3d at 1217 (claimant's "inconsistent statements about the money and his reasons for being in Phoenix tended to support an inference that the money was drug-related"); *see also $191,910.00 in U.S. Currency*, 16 F.3d at 1072 (discrepancies in story may be factors to consider in determining probable cause).

Finally, Cruz acknowledged that he had, in fact, purchased a quantity of marijuana in California several days before the seizure. Doc. #18, Ex. A, 94:25-95:6). At the time of the seizure, Cruz was on his way back to California. Coupled with Cruz's inability to fully explain his travel and activities in the two weeks prior to the seizure, the Court finds these facts strongly support an inference that Cruz, and by extension the Defendant currency, was connected to illegal drug activity.

Considering the aforementioned aggregate of facts, the Court finds that the United States has set forth sufficient evidence to establish by a preponderance of the evidence a substantial connection between the Defendant $102,836.00 and drug trafficking.

**C.     Innocent Ownership and Legitimate Source**

Because the facts demonstrate a substantial nexus between the Defendant currency and drug trafficking activities, the burden shifts to Cruz to "prove the money had an independent source and had not been used illegally." *$22,474.00 in U.S. Currency*, 246 F.3d at 1217 (citing *$215,300.00 in U.S. Currency*, 882 F.2d at 420). Here, Cruz claims that the Defendant currency was from his savings over the years, including $29,075.46 from a settlement with Chrysler, $90,000.00 from the sale of a vehicle to Russell Pike, and $30,000.00 from the sale of his business. Doc. #22-1 (Cruz Decl.), ¶17. Moreover, Cruz claims that the Defendant currency was for the cash purchase of a house in Battle Mountain from one of his father's neighbors. *Id.* at ¶18. In support thereof, Cruz provided documentation regarding the aforementioned settlement with Chrysler on April 28, 2009,

///

///

///

16

over one year prior to the traffic stop and currency seizure.[14]  Ex. 1.  He also provided the Agreement for Purchase and Sale of Business for $30,000.00 on March 17, 2009.[15]  *Id.* at Ex. 3.  However, the bank statement offered in support of Cruz's contention that he received $90,000.00 from the sale of a vehicle to Russell Pike fails to substantiate the same.  *See id.* at Ex. 2.  While the bank statement indicates a deposit of $90,000.00 was made on January 28, 2008, there is no indication whatsoever as to the source of that money.  *See id.*  Finally, Cruz offers nothing to substantiate his narrative that he intended to purchase a home for cash in Battle Mountain.  Cruz does not identify the owner/seller of the home or the address of the home.  Nor does he provide any evidence that he was in contact with anyone regarding the purchase of the home.  Cruz fails entirely to explain why any such purchase needed to be completed with over 2,000 twenty-dollar bills and various other cash denominations, rather than other more secure methods of purchase.  Finally, he does not explain why he left Battle Mountain to return to California with the Defendant currency in his vehicle when he supposedly intended to purchase a home there.

---

[14]  The United States' argument regarding the probative value of the settlement letter at issue is well taken.  The letter was addressed to Cruz and Cruz's mother, Ernestina Bounds. Doc. #22-1, Ex. 1.  However, there is no indication that the settlement check was made payable to Cruz, was deposited by Cruz into his bank account, or was otherwise negotiated by Cruz.  There is no evidence that the vehicle, which was the subject of the settlement, was owned by Cruz.  Finally, there is no evidence that any portion of the currency seized in the July 2010 traffic stop is traceable to any portion of the April 2009 settlement letter or check.  Nevertheless, on a motion for summary judgment, the Court must view the evidence presented, along with all reasonable inferences which flow therefrom, in the light most favorable to the non-moving party.  Here, the Court finds that is it is reasonable to infer, although perhaps only slightly so, that the Chrysler settlement was an innocent source of the Defendant currency.

[15]  Here too, the United States' skepticism regarding the March 2009 purchase and sale agreement is well taken.  There is no evidence that the purchase price of $30,000.00 was ever deposited into Cruz's bank account or otherwise negotiated by him.  There is no evidence that Cruz actually owned Diamante Customs or had any association with Diamante Customs.  Cruz's federal income tax returns do not reflect ownership of any such business or the sale of any such business.  Finally, there is no evidence that any portion of the currency seized in the July 2010 traffic stop is traceable to any portion of the March 2009 sale, if such a sale was ever consummated.  Nevertheless, the Court finds that it is reasonable to infer, although perhaps only slightly so, that Cruz legitimately acquired $30,000.00 in the sale of Diamante Customs.

Contrary to Cruz's averments, the Court concludes that a reasonable jury could not return a verdict for Cruz by a preponderance of the evidence based on the quality of evidence presented. *See United States v. Lot 4, Block 5 of Eaton Acres*, 904 F.2d 487, 490 (9th Cir. 1990) ("[a] genuine issue of fact exists when the nonmoving party produces evidence on which a reasonable trier of fact could find in its favor, viewing the record as a whole in light of the evidentiary burden the law places on that party"). While Cruz produced evidence demonstrating a legitimate source of $59,075.46, he failed to produce any useful evidence that might verify his claim that he received an additional $90,000.00 from the sale of a vehicle. Additionally, Cruz is unable to reconcile how he came to own or possess a $90,000.00 vehicle in January 2008 when he was unemployed for at least part of 2007 and his total reported income from 2006 and 2007 was wages in the amount of $58,092.00. Finally, Cruz does not contest that, upon being presented with the results of the vehicle search and questioned regarding the origin of the currency discovered, he stated to Officer Phillips that he had sold a business and had also earned the money through wages and gaming. Doc. #16, ¶20. This inconsistency renders his explanation as to the source of the money even more implausible. Lastly, without any further detail or corroborating evidence, Cruz's story that he intended to purchase a home for cash in Battle Mountain is simply not worthy of serious consideration. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (explaining that uncorroborated allegations and "self-serving testimony" do not create a genuine issue of material fact); *FTC v. Publ'g Clearing House*, 104 F.3d 1168, 1171 (9th Cir. 1997)("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").

**IV.   Conclusion**

Considering the aggregate of facts, including information yielded in formal discovery, as well as Cruz's unsupported and implausible explanation for the source and ownership of the Defendant currency, the Court finds that summary judgment in favor of the United States is appropriate. *See $42,500.00 in U.S. Currency*, 283 F.3d at 981 (affirming summary judgment of

forfeiture based on aggregate of facts including suspicious travel plans, large amount of cash, packaging of cash, positive canine alert, and implausible story).

IT IS THEREFORE ORDERED that the United States' Renewed Motion for Summary Judgment (Doc. #33) is GRANTED.

IT IS FURTHER ORDERED that the Clerk of the Court shall enter judgment in favor of the United States and against Claimant Cruz.

IT IS SO ORDERED.

DATED this 26th day of September, 2014.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE